# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Hazel Hawkins Memorial Hospital
 911 Sunset Drive
Hollister, CA 95023

Emanate Health Foothill Presbyterian Hospital
250 S Grand Avenue
Glendora, CA 91741

Denver Health & Hospital Authority
777 Bannock Street
Denver, CO 80204

UCH-Memorial Health System
1400 East Boulder Street
Colorado Springs, CO 80909

Winter Haven Hospital
200 Ave F NE
Winter Haven, FL 33881

Baptist Health Medical Center - Jacksonville
800 Prudential Drive
Jacksonville, FL 32207

Baptist Medical Center - Beaches
1350 13th Ave S
Jacksonville Beach, FL 32250

Baptist Medical Center - Nassau
1250 S 18th Street
Fernandina Beach, FL 32034

WellStar West Georgia Medical Center
1514 Vernon Road
LaGrange, GA 30240

Wellstar Spalding Regional Hospital
601 S 8th Street
Griffin, GA 30224

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

AU Medical Center
1120 15th Street
Augusta, GA 30912

Wellstar Kennestone Regional
Medical Center
677 Church Street
Marietta, GA 30060

Wellstar Paulding Medical Center
2518 Jimmy Lee Smith Parkway
Hiram, GA 30141

Wellstar Cobb Medical Center
3950 Austell Road
Austell, GA 30106

Wellstar Douglas Hospital
8954 Hospital Drive
Douglasville, GA 30134

Wellstar North Fulton Hospital
3000 Hospital Boulevard
Roswell, GA 30076

Swedish American Hospital
1401 E State Street
Rockford, IL 61104

Stormont Vail Hospital
1500 SW 10th Avenue
Topeka, KS 66604

Saint Luke's Cushing Hospital
711 Marshall Street
Leavenworth, KS 66048

Saint Luke's South Hospital
12300 Metcalf Avenue
Overland Park, KS 66213

Owensboro Health Regional Hospital
1201 Pleasant Valley Road
Owensboro, KY 42303

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

Saint Luke's North Hospital
5830 NW Barry Road
Kansas City, MO 64154

St. Luke's Hospital of Kansas City
4401 Wornall Road
Kansas City, MO 64111

Saint Luke's East Hospital
100 NE St Lukes Boulevard
Lee's Summit, MO 64086

The Nebraska Medical Center
4350 Dewey Avenue
Omaha, NE 68105

New York Downtown Hospital
170 William Street
New York, NY 10038

Monument Health Rapid City Hospital
353 Fairmont Boulevard
Rapid City, SD 57701


                Plaintiffs                    |    **Case No.**

                     v.

**ROBERT F. KENNEDY, JR.,**
In his Official Capacity as Secretary, U.S.
Department of Health & Human Services
200 Independence Avenue, SW
Washington, D.C. 20201

                Defendant

                                                    ,

**COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT**

## JURISDICTION AND VENUE

1.      This is a civil action brought to obtain judicial review of a final decision rendered by the Provider Reimbursement Review Board ("PRRB" or the "Board"), acting as a component of the United States Department of Health and Human Services ("HHS"). The determination for which judicial review is hereby sought is PRRB Cases No. 25-3081GC.

2.      This action arises under Title XVIII of the Social Security Act, as amended (42 U.S.C. §1395 et. seq.), hereinafter referred to as the "Medicare Act" or the "Act", and the Administrative Procedure Act, 5 U.S.C. § 706.

3.      This Court has jurisdiction under 42 U.S.C. §1395oo(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1361. Venue lies in this judicial district pursuant to 42 U.S.C. §1395oo(f), and 28 U.S.C. § 1391(e).

4.      Further, this Court has jurisdiction under 42 U.S.C. §1395oo(f), 28 U.S.C. §1331, and 28 U.S.C. §1391(e) because:

     (a)      Each Provider filed cost report (for FYE 1988) as required by 42 U.S.C. §1395oo(a);

     (b)      Providers were dissatisfied with its fiscal intermediary's final determination, "...as to the amount of total program reimbursement due the provider... for the period covered by such report," as required by 42 U.S.C. §1395oo(a)(2);

     (c)      The amount in controversy for each provider exceeds $10,000, as required by 42 U.S.C. §1395oo(a)(3);

     (d)      Each Provider timely filed an appeal with the PRRB pursuant to 42 U.S.C. §1395oo(a)(3);

     (e)      The Board effectively dismissed each Provider's appeal by notifying each Provider on April 15, 2025 that its appeal had been dismissed;

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

(f)     This civil action is filed within sixty (60) days of the date that each Provider was

notified by the PRRB, in writing that its appeal was dismissed as evidenced by

its letter dated April 21, 2025. (**Exhibit A**).

**5.**     Plaintiffs have exhausted all administrative remedies under federal law.

<u>**PARTIES**</u>

6.     Each Plaintiff herein (hereinafter, "Plaintiffs", "Providers" or "Plaintiff Providers") is an acute

care, in-patient healthcare facility that serves a disproportionate share of low-income patients. At all

relevant times, each Plaintiff Provider had a Medicare provider agreement with the Secretary of

Health and Human Services and was eligible to participate in the Medicare program. This case is

comprised of sixty-PRRB cases, each such appeal setting forth the same issues for fiscal years ranging

from 1988 to 2013. A full listing of each group appeal by name and case number is found at ten

through twelve of Exhibit A.

7.     Defendant, ROBERT F. KENNEDY, JR., Secretary of the Department of Health and Human

Services ("Secretary"), or his predecessors in office, is the federal officer responsible for the

administration of the Medicare program. Defendant Kennedy is sued in his official capacity.

8.     As set forth more fully below, Plaintiffs object to the dismissal of each of its appeals by the PRRB

as arbitrary, capricious and a violation of the rightful and allowing claims of Plaintiffs.

9.     Also as set forth more fully below, Plaintiffs object in particular to the Board's dismissal of the

appeal of each Plaintiff as demonstrating a clear showing of its bad faith exercise of its discretion,

which, under its own Board Rule 47.3, it may reinstate a case dismissal for failure to comply with its

procedures upon the Provider's, "written motion demonstrating good cause..."

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

## MEDICARE STATUTORY AND REGULATORY BACKGROUND

10.     Title XVIII of the Social Security Act, Pub. L. No. 89-97, 79 Stat. 291, as amended by 42 U.S.C. §§1395 et. seq. ("the Medicare program"), establishes a program of medical benefits for persons aged 65 or older, and also for persons under age 65 who are disabled. The Centers for Medicare and Medicaid Services "CMS") formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (HHS) charged with administering the Medicare program.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND

11.     The Medicare program was established to provide health insurance to the age and disabled. 42 U.S.C. §§1395-1395cc. The Centers for Medicare & Medicaid Services (CMS), formerly the Health Care Financing Administration (HCFA), is the operating component of the Department of Health and Human Services (HHS) charged with administering the Medicare program.

12.     Medicare reimburses the operating costs of short-term acute care hospital inpatient services primarily through the hospital Inpatient Prospective Payment System (IPPS). 42 U.S.C. §1395ww(d). The IPPS statute contains a number of provisions that adjust reimbursements based on Provider-specific factors. *See* 42 U.S.C. §1395ww(d)(5). This case involves the Provider-specific disproportionate share hospital (DSH) adjustment, which requires the Secretary to provide increased IPPS reimbursement to providers that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

13.     Whether a Provider qualifies for the DSH adjustment, and how large an adjustment it receives, depends on the Provider's "disproportionate patient percentage" (DPP). 42 U.S.C. § 1395ww(d)(5)(F)(v). The DPP is the sum of two fractions, the so-called "Medicare Fraction" and Medicaid Fraction," for a Provider's fiscal period. 42 U.S.C. §1395ww(d)(5)(F)(vi). Providers whose

DSH percentages meet certain thresholds receive an adjustment which results in increased IPPS payments for inpatient hospital services. 42 U.S.C. §1395ww(d)(5)(F)(ii).

14.     The first Fraction's numerator is the number of a provider's inpatient days for such period who (for such days) were entitled to both Medicare Part A and Supplemental Security Income (SSI) benefits, and the denominator is the number of patient days for patients entitled to Medicare Part A. 42 U.S.C. § 1395ww(d)(5)(F)((vi)(I). This case involves this first fraction, which is hereinafter referred to as the SSI fraction, or the Medicare Fraction.

15.   The second fraction's numerator is the number of Provider patient days for patients who (for such days) were eligible for medical assistance under a State Plan approved under Title 19 of the Social Security Act, 42 U.S.C. §1396-1 et seq., for such period but not entitled to benefits under Medicare Part A, and the denominator is the total number of the Provider's inpatient days for such period. *Id*. The second fraction is frequently referred to as the Medicaid Fraction.

16.     The Statute provides that a provider's DPP shall be determined according to the provider's cost reporting period. 42 U.S.C. 1395ww(d)(5)(F)(vi) ("in this subparagraph, the term 'disproportionate patient percentage' means, with respect to a cost reporting period of a hospital . . . . ". Contrary to the Statute, and for administrative convenience, the Secretary determines a provider's DPP based on the Federal Fiscal Year, but, in recognition of a provider's statutory right, allows a provider to request that it DPP be redetermined based on the provider's cost reporting period. Such a request is known as a request for "realignment." A realignment determination is supposed to involve only a change in time period. The Secretary is not permitted to change the underlying substantive standards used in processing the provider's original DPP, regardless of whether such change would be beneficial or detrimental to the provider.

17.    The DSH program was enacted by Congress in the Consolidated Omnibus Budget Reconciliation Act of 1985 and was made effective beginning with discharges on or after May 1, 1986. Pub. L. No. 99272, § 9105, 100 Stat. 158-60 (Apr. 7, 1986).

18.     The Secretary implemented the DSH program through the publication of an interim final rule on May 6, 1986. 51 *Fed. Reg.* 16,772 (May 6, 1986). In the May 6, 1986 final rule, the Secretary decreed that only Medicare beneficiaries who are "recipients" of SSI, i.e., only those Medicare beneficiaries who have actually received payment, in a given month will have their inpatient hospital stay days counted in the numerator of the Medicare Fraction for that month. *Id.* at 16,777. In the August 16, 2010 final rule, the Secretary maintained that "our policy has always been to include only Medicare beneficiaries who are entitled to receive SSI benefits in the numerator of the SSI fraction." 75 *Fed. Reg.* 50042, at 50280 n.19 (Aug. 16, 2010). The Secretary's policy is that only Medicare beneficiaries who are paid SSI cash benefits for a given month are "entitled to receive SSI benefits" for purposes of including the inpatient days associated with such beneficiaries in the numerator of the SSI fraction (a/k/a Medicare Fraction). The Secretary does not consider beneficiaries who received non-cash SSI benefits for a particular month to be "entitled to receive SSI benefits." And as explained below, the Secretary's policy is to omit the inpatient days of certain Medicare beneficiaries who: (1) were entitled to be paid SSI for the month(s) of their hospital stay; and (2) at the time of a data match between SSA and CMS, were known by SSA to be entitled to SSI payment for such month(s); but (3) had not actually received payment for such month(s) by the time the data match was performed.

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

19.     The Social Security Administration (SSA) administers the SSI program; therefore, identifying patients who were entitled to SSI during their hospitalization requires access to SSA's SSI data.

20.     To enable CMS to calculate the SSI Fraction, SSA sends CMS an annual "eligibility file" that includes information on all SSI recipients whom SSA has coded with one of three payment status codes: C01 (current pay), M01 (forced pay), and M02 (forced due). Although SSA has dozens of payment status codes, CMS's policy is that only C01, M01, and M02 indicate SSI entitlement for purposes of the numerator of the SSI Fraction. *See* 75 *Fed. Reg.* at 50,042, 50,280 (Aug. 16, 2010).

Therefore, at CMS' request or direction, only those individuals with one of the three above referenced payment status codes are listed on the "eligibility file."

21.     SSA does not include payment status codes in the SSI eligibility file but does include monthly indicators denoting which month(s) each person received SSI payments. *See id.* at 50,276; *see also* 51 *Fed. Reg.* 31,454, 31,459 (Sept. 3, 1986) (stating that the SSI file "lists all SSI recipients for a 3-year period and denotes the months during that period in which the recipient was eligible for SSI benefits").

22.     CMS then computes the SSI fraction by matching individuals appearing in the SSA's eligibility file with its own Medicare inpatient data to identify a patient's entitlement to SSI benefits. *Pomona Valley Hosp. Med. Ctr. v. Azar*, No. CV 18-2763 (ABJ), 2020 WL 5816486, at *2 (D.D.C. Sept. 30, 2020) (citing 75 *Fed. Reg.* at 50,281). In other words, "CMS identifies the individuals appearing in both two data sets to determine the number of patients, and the inpatient days for those patients at each hospital, for the applicable fiscal year to calculate the hospital's SSI numerator." *Id*.

23.     The data match between SSA and CMS for any given Federal fiscal year is conducted approximately 15 months after the end of that fiscal year. If, at the time the data match is performed, a Medicare beneficiary was paid SSI cash benefits for a month covered by the data match, any inpatient hospital days associated with such beneficiary will be counted in the numerator of the Medicare

Fraction. For example, if Medicare Beneficiary is an inpatient in Hospital (a Medicare certified short-term acute care hospital) from April 29 -May 6, 2022 and, by the time the SSA eligibility file is constructed for that year, was paid SSI for April but not for May, the days April 29 - 30 would be counted in the numerator of the Medicare Fraction, and the days May 1 -6 would not be counted.

24.    After the SSA-CMS data match is performed, CMS does not make adjustments to the Medicare Fraction based upon subsequent, retroactive corrections to the eligibility status of a Medicare beneficiary. Thus, for example, if Medicare Beneficiary filed an application for SSI based on disability on January 1, 2023 and had an inpatient stay in July 2023, but was not, at the time of her stay, adjudicated eligible for SSI, Medicare Beneficiary would not appear on the SSA eligibility tape, and thus the days associated with her July 2023 stay would not be counted in the numerator of Hospital's Medicare Fraction. Moreover, if, six months after the data match for Fiscal Year 2023 was performed, Medicare Beneficiary was awarded SSI based on disability retroactive to January 1, 2023, the days associated with Medicare Beneficiary's July 2023 stay nevertheless would not be added to the numerator of Hospital's Medicare Fraction. In this example, at the time the data match was performed, neither SSA nor CMS knew that Medicare Beneficiary would subsequently be awarded SSI based on disability.

25.    However, in contrast to the example given in the previous paragraph, there are situations in which (a) a Medicare beneficiary does not receive SSI payment for a particular month, (2) is entitled to SSI payment for that month, and, at the time of the data match, is known by SSA to be so entitled, but (3) inpatient days associated with such individual nevertheless are not counted. For example, if, for a given month, an individual does not have a bank account or is considered by SSA to need a representative payee but no payee has yet been designated, or SSA does not have a valid address for such individual, SSA will not make payment to that individual for that month. If the administrative reason for not making payment is not resolved by the time the SSI eligibility file is constructed, the inpatient days associated with such

beneficiary will not be included in the numerator of the Medicare Fraction because CMS requests or directs SSA to include only individuals with payment status codes C01, M01, or M02.

26.     SSA's Programs Operating Manual System (POMS) is sub-regulatory guidance published by and used by SSA to implement the SSI program. Section SI 02301.201of the POMS is entitled "Description of SSI Post-eligibility (PE) Events." It states in the Introduction portion that "[t]he term 'eligible' in this subchapter means that a recipient meets all eligibility requirements for part or all of a past or current month(s)." Section SI 02301.201B.2. is entitled "Stop Payment." It explains that "[a] stop payment is an interruption in payment. It is not a loss of eligibility. Payments may be reinstated for past or current month(s) on a stop pay record regardless of the period in non-pay." Section SI 02301.201B.2. specifically mentions the situation in which an SSI eligible individual needs a representative payee but the SSA field office has not appointed one as a "stop payment."

27.     Under the Secretary's policy not all individuals who are entitled to SSI have their inpatient days included in the Medicare Fraction during the month(s) of their hospital stay, either because they are entitled to SSI but were not entitled to SSI cash payments during such month(s), or were entitled to SSI cash payments but were not paid SSI cash payments for such month(s).

28.     CMS' payment and audit functions under the Medicare program are contracted out to insurance companies known as Medicare Administrative Contractors (hereinafter, the "MAC"). MACs determine payment amounts due the providers under Medicare law and regulations. 42 U.S.C. § 1395h, 42 C.F.R. §§413.20(b) and 413.24(b). Although the MAC calculates the DPP, CMS computes the SSI fraction.

29.     At the close of its fiscal year, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. The MAC reviews the cost report, determines the total amount of Medicare reimbursement due to the provider and issues the provider a Notice of Program Reimbursement (NPR).

## CMS FINAL RULE-1739-F

30.     On June 9, 2023, the Secretary issued a final rule, CMS-1739-F, a/k/a the "Part C Days Retroactive Final Rule. 88 *Fed. Reg.* 37,772. In this final rule CMS finalized its proposal to adopt retroactively for all periods prior to October 1, 2013, the counting of Part C Days in the denominator of the Medicare Fraction component of the DPP.

31.     The Part C Days Retroactive Final Rule is without legal authority under the Secretary's limited authority to engage in retroactive rulemaking. *See* 42 U.S.C. § 1395ff(e). It also impermissibly conflicts with the pre-October 1. 2013 regulations at 42 C.F.R. § 412.106, which place only "covered" Medicare days in the denominator of the Medicare Fraction, is also arbitrary and capricious, and is not a logical outgrowth of the proposed rule which sought to limit the retroactive period to 2004.

## CMS TRANSMITTALS 12747 AND 12785

32.     CMS issued Transmittal 12747 (Change Request 13413) on July 26, 2024. It states that with the issuance of the Part C Days retroactive final rule (CMS-1739-F), "the processing of realignment requests for cost reporting periods starting before FY 2014 will resume. For realignment requests for cost reporting periods starting before FY 2014, CMS will calculate cost reporting period SSI ratios for all periods, for all hospitals, and post those ratios to the CMS DSH website ([https://www.cms.gov/medicare/medicare-fee-for-servicepayment/acuteinpatientpps/dsh](https://www.cms.gov/medicare/medicare-fee-for-servicepayment/acuteinpatientpps/dsh)) under the header 'CMS 1739-F SSI Ratios." Like the Federal fiscal year SSI ratios, these cost reporting period SSI ratios for cost reporting periods starting before October 1, 2013, have been determined pursuant to CMS-1739-F using the data available to CMS."

33.     Thus, CMS is illegally including Part C days in the denominator of the Medicare Fraction in processing requests for realignment. CMS's action is illegal because, in processing requests for

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

realignment, it has no authority to change the substantive standards that were used in the original determination of the provider's DPP, and because it has no authority to place Part C days in the denominator of the Medicare Fraction retroactively

34.     CMS Transmittal 12747 was "rescinded and replaced" by Transmittal 12785, published on August 13, 2024. The policy announced in Transmittal 12747 was carried over into Transmittal 12785. Transmittal 12785 states that all information in Transmittal 12747 "remains the same" in Transmittal 12785. Plaintiffs allege that Transmittal 12785 is invalid on its face, should be enjoined and should not be applied to the calculations.  In this matter, Plaintiffs are appealing from the publication of Medicare/SSI Fractions on CMS website on August 26, 2024 that was done pursuant to Transmittal 12785.

<u>**THE RELEVANT MEDICARE APPEALS PROCESS**</u>

35.     At the close of its fiscal year, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. §413.20. Under the Medicare program, each hospital's MAC is required to analyze and audit the hospitals annually submitted Medicare cost report and issue a Medicare Notice of Amount of Program Reimbursement (<u>NPR</u>), which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's fiscal year. 42 C.F.R. § 405.1803. In addition to including costs on its cost report, a hospital is also required to make a claim, or alternatively self-disallow, for any adjustment to its basic IPPS payment adjustment, such as the DSH adjustment. 42 C.F.R. § 413.24(j).

36.     If a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in the NPR, and the hospital satisfies the amount in controversy requirements, the hospital has a right to obtain a hearing before the Board by filing an appeal within 180 days of receiving its NPR (or any revised NPR). 42 U.S.C. §1395oo(a); 42 C.F.R. § 405.1835(a). In addition to having the authority to make substantive

decisions concerning Medicare reimbursement appeals, the Board is authorized to decide questions relating to its jurisdiction and procedure. *See* 42 U.S.C. §1395oo. Further, the Board is required to "affirm, modify, or reverse . . . ***and*** to make any other revisions on matters covered by such cost report[.]" *See* 42 U.S.C. § 1395oo(d) (emphasis added). That is, the Board cannot avoid making necessary revisions on matters properly before it.

37.     The decision of the Board on substantive or jurisdictional issues constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the Board's decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1875, 405.1877. The Secretary has delegated its authority under the statute to review the Board decisions to the CMS Administrator. *See* 42 C.F.R. §§ 405.1875, 405.1877. Thus, the Secretary's final administrative decision for purposes of judicial review is either the decision of the Board or the decision of the CMS Administrator after reviewing the Board's decision. *See* 42 C.F.R. § 405.1877(a)(2).

38.     A hospital may obtain judicial review by filing suit within 60 days of receipt of the Secretary's final administrative decision in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia. 42 U.S.C. §1395oo(f)(1). The Secretary is the proper defendant in such an action. *See* 42 C.F.R. § 405.1877(a)(2). Under 42 U.S.C. §1395oo(f)(2), interest is to be awarded in favor of the prevailing party in an action brought under 42 U.S.C. §1395oo(f). Under 42 U.S.C. § 1395g(d), CMS is required to pay interest on underpayments to Medicare providers, if the underpayment is not paid within thirty days of a "final determination."

39.     Judicial relief is also available under the equitable remedy of mandamus where a hospital has a clear right to the relief sought and the Secretary has a defined and non-discretionary duty to honor that right. *Monmouth Med. Ctr. v. Thompson*, 257 F.3d 807, 813 (D.C. Cir. 2001); *Lutheran Med. Ctr. v. Thompson*, 520 F. Supp. 2d 414, 419 (E.D.N.Y. 2007).

40.     Jurisdiction is also available under 28 U.S.C. § 1331 where the agency renders a final determination and there is no administrative appeal available for that determination. *Am. Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005).

## APPLICABILITY OF THE APA TO MEDICARE APPEALS

41.     Under 42 U.S.C. §1395oo(f)(1), an action brought for judicial review of final agency action involving PRRB appeals "shall be tried pursuant to the applicable provisions under chapter 7 of title 5" of the U.S. Code, which contains the Administrative Procedure Act (APA). Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. §706(2)(A). Further, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . unsupported by substantial evidence in a case . . . reviewed on the record of an agency hearing provided by statute[.]" 5 U.S.C. §706(2)(E).

## FACTS SPECIFIC TO THIS MATTER

42.     The PRRB received Plaintiffs' Group Appeal Request on February 21, 2025 (Case No. 25-3081GC). The subject of each Plaintiffs' group appeal was described as: "Medicare Fraction (SSI) – Statutory & Systemic Errors -GCE CIRP Group". The significance of the acronym, "GCE" is in its meaning, Good Cause Extension. relating to the facts giving rise to the Board's dismissal (full relevance, set forth below).

43.     It is undisputed that Plaintiffs' Group Appeal request was filed by its authorized representative, Quality Reimbursement Services - a Medicare reimbursement consulting firm – on behalf of Plaintiffs.

44.     In its appeals, Plaintiffs contended that the Medicare Fractions published on CMS' website on August 13, 2024, pursuant to **CMS Transmittal 12785**, were determined incorrectly due to the "inclusion of Medicare Part C days in the denominator of the Fraction and... exclusion of days from the numerator

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

of the Medicare Fraction associated with individuals who were entitled to Supplemental Security Income ("SSI") during their hospital stay but who were not in SSI pay status during such days, or were in SSI pay status during their hospital stay but were not assigned payment status code C01, M01 or M02." (Exh. A., at pg. 1). The aforementioned Part C issue and the omission of numerous status codes were the issues before the Board and are now before this Court.

45.    At the time of the filing of their appeals between February 21 and 28, 2025, and within their requisite Issue Statement, *supra*, Plaintiffs requested a "GCE" or Good Cause Extension to file their appeals as a result of unforeseeable wildfires that began on January 7, 2025 in greater Los Angeles, as well as in the vicinity of their authorized representative, QRS's corporate offices that wreaked havoc on the normal operations of their offices for several weeks.

46.    To be clear, On January 7, 2025, at least 10 wildfires started in Los Angeles County and surrounding areas, with the Palisades, Eaton, Hurst, and other fires igniting that day. These fires quickly spread and were exacerbated by drought conditions, low humidity, and fierce winds. By January 21, 2025, California was battling four active wildfires, with a total of approximately 37,794 acres burned. The Palisades and Eaton fires, which began on January 7, were among the most destructive in California since records began in 1932, according to NOAA. The aforementioned Eaton fire located in Altadena, California (Los Angeles County) was one of the most devastating fires in Los Angeles County to start on January 7, causing the greatest loss of life of all the firestorms.

47.    The corporate offices of Plaintiffs' duly appointed representative, QRS is located at 150 North Santa Anita Avenue in the city of Arcadia. Arcadia is one of several communities that border Alta Dena and the location of the Easton wildfire. As noted in the Declaration of Maria Munoz, attached to **Exhibit B,** QRS's corporate office is just seven miles from the core of the Eaton fire, and close enough to be seen from the office windows at QRS. As also noted by Ms. Munoz, the president and owner of QRS, Mr.

James Ravindran had a residence and home office located in Arcadia and was mandatorily evacuated from his residence on January 7. Indeed, he would be forced away from that residence for nearly three days. The clear commotion that the Eaton fire created in the immediate fire zone vicinity, including the city of Arcadia, is amply described by Ms. Munoz. It can be well understood how this enormous fire and its after effects caused significant business disruption and operations at QRS continued well after the initial wild fire (of ten) ignited in Los Angeles County) on January 7. In fact, the fire disaster understandably caused a backlog of files at QRS needing attention and filings by specific deadlines throughout January and February, 2025 including the filing of the instant appeals, as the QRS office operations were disrupted.

48.    As part of its appeals filing, QRS on behalf of Plaintiffs noted that its request for a good cause extension was due to the close proximity of the wild fires to QRS's corporate offices, which "...experienced substantial operational challenges, including office closures, communication failures, and staff displacement." *See,* **Exhibit A,** at p. 8. This explanation was intended to specifically serve as the basis of Plaintiffs' good cause extension (GCE) request inasmuch as the filing of the appeals was in fact twelve (12) days beyond the deadline for filing the appeal, within the Board-imposed 180-day limit.

49.    It should be indisputable that under the extraordinary circumstances created by the Eaton fire, Plaintiffs' failure to file their group appeal request in a timelier fashion (or by the February 9 deadline should more than demonstrate and meet or exceed the good cause requirement under the provisions of 42 C.F.R. §405.1836 and PRRB Rule 2.1.4.

50.    A large, blazing fire, let alone one where weather and wind conditions spawned impacted much of Los Angeles County on January 7, 2025, in a surrounding area in close proximity to the QRS office and Mr. Ravindran's residence/home office can and did have widespread and devastating effects, while generally impacting public health, infrastructure, the environment, and the economy. The combined

effect of approximately 10 wildfires in LA County on that day would most assuredly be felt for miles, even hundreds of miles away.

51.  Finally, to further illustrate the enormity and severe impact felt by residents and business people throughout LA County on January 7 and for weeks and weeks thereafter, including those such as QRS in such close proximity to one of the largest fires that day, both the state of California's Franchise Tax Board and the Federal Internal Revenue Service issued *six month extensions* for residents to file their state and federal tax returns (otherwise due by April 15).

### a. The Basis for the Board's Dismissal of Plaintiffs' Appeals is Entirely Unclear

52.  Although the Board spends page after page in its Dismissal Letter (**Exhibit A**) that the cause for its dismissal of Plaintiffs' appeals was due in part to the untimeliness of the filing thus giving rise to Plaintiffs having to go into length to discuss the impact of the fire to explain the twelve-day late filing, it could also be said, based upon the Board's Dismissal Letter (**Exhibit A**) that perhaps the *sole* reason for the Board dismissing Plaintiff's appeals was Plaintiffs' reliance upon the CMS's publication of **Transmittal 12785** and the Medicare/SSI Fraction data published pursuant to that Transmittal as constituting a "final determination" by the Board. And in fact, it served as the basis of Plaintiffs' appeals, *supra* as well as the basis for the instant Complaint that is set forth and quoted in paragraph 23, *infra.*

53.  Indeed, and adding to the total lack of clarity within the Board's Dismissal Letter, not only does the Board determine that Plaintiffs' explanation for the late filing of their appeals due to the natural catastrophe as failing to comprise "good cause" for their delay (**Exh. A** p. 7), the Board then states that, "As the Medicare/SSI Fraction data published pursuant to Transmittal 12785 is not an appropriately appealable final determination, the untimeliness of the Provider's filings is not an issue." Therefore, as there is no need to further address the Providers' request for a good cause extension…." (**Exh. A** p. 6).

Arguably then, the issue of untimeliness of Plaintiffs' filing of its appeals twelve days beyond the deadline need **not** be addressed by this Court.

**b. The Issuance of Transmittal 12785 is an Appealable Final Determination**

54.    Plaintiffs allege that the issuance of Transmittal 23785 constitutes an appealable final decision and therefore, this Court has appropriate jurisdiction over the issues presented in this complaint because **Transmittal 23785**, which is controlling in the instant appeals, is invalid on its face and may not be applied to the calculation of Plaintiffs' DSH calculations.

55.    As noted *supra*, CMS issued Transmittal 12747 (Change Request 13413) on July 26, 2024. That Transmittal was illegal and invalid on its face in that CMS is now illegally including Part C days in the denominator of the Medicare Fraction in processing requests for realignment. CMS's action is illegal because, in processing requests for realignment, it has no authority to change the substantive standards that were used in the original determination of the provider's DPP, and because it has no authority to place Part C days in the denominator of the Medicare Fraction retroactively

56.    CMS Transmittal 12747 was "rescinded and replaced" by **Transmittal 12785**, published on August 13, 2024. The policy announced in Transmittal 12747 was carried over into Transmittal 12785. **Transmittal 12785** states that all information in Transmittal 12747 "remains the same" in Transmittal 12785.

57.    Inasmuch as the application of the provisions of **Transmittal 12785** cause prejudice to Plaintiffs in that it decreases the provider's DPP that has been calculated by the MAC by applying that Transmittal as instructed by CMS, the pursuance of an adjudication hearing before the Board Panel (following the provisions of that same Transmittal) becomes irrelevant and moot.  Utilization of Transmittal 12785

COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION ON
MEDICARE REIMBURSEMENT

provided, with some finality, "advance knowledge of the amount of [the DSH] payment." *See, Battle Creek Health System, et. al., v. Becerra,* 2023 WL 7156125 (D.D.C. Oct. 31, 2023), *appeal docketed,* No. 23-5310 (D.C. Cir. December 29 2023); *Baylor All Saints Med. Ctr. Becerra,* 2024 WL 3833278 (N.D. Tex. Aug. 15, 2024), *appeal docketed,* No. 24-10934 (5th Cir. October 17, 2024), where the courts held that ***providers met the requirements for a Board appeal before receiving a final appealable determination as to the amount of the DSH payment.***

58.    Therefore, the Medicare/SSI Fraction data published pursuant to Transmittal 12785 is an appropriately appealable final determination and hence, this Court has appropriate jurisdiction over the issues in this matter. As the supposed "untimeliness" of Plaintiffs' appeals filings is, per the Board's own determination *not* at issue, the Secretary's dismissal of Plaintiffs' appeals was wholly arbitrary, capricious, and inappropriate under federal law and in particular, the Medicare Act.

## COUNT I

59.    Plaintiff hereby incorporates by reference paragraphs 1 through 58 of the Complaint as though fully set forth herein.

60.    The provisions of 42 C.F.R. § 405.1853 unambiguously give the Board discretion to extend deadlines for the submission of papers, including a provider's Issue Statement. And, indeed the Board did not choose to do so, so that Plaintiffs' appeals were filed a mere twelve to nineteen days beyond the administrative deadline. Of course, if Board members were even remotely aware of the possible impact of the LA wild fires on QRS and its offices in Arcadia (southern California), they might assume that its deadline to file of February 12, less than a month after the eruption of the fires, might, given the highly unusual circumstances, get away from the attention of QRS staffers.

PLAINTIFF'S COMPLAINT FOR JUDICIAL REVIEW OF ADVERSE AGENCY DECISION

61.     Yet even should it be the case that not a single Board member recognized that QRS's corporate location was in close proximity to the Eaton fire, the Board's own Rule 47.3, providing that administrative oversights can be set aside upon the provider's demonstration of "good cause", the circumstances herein should surely qualify as an understandable "oversight".

63.     The Board's decision to dismiss Plaintiffs' appeal, was arbitrary and capricious in violation of 5 U.S.C. §706(2) by failing, in good faith, to adhere to its own promulgated Rules and failing to exercise its sound discretion by not inquiring further of Plaintiffs for a showing of good cause why the Board should not dismiss the appeal. Indeed, in this very instance. The Board and its staff could clearly see that QRS erroneously filed two identical Representation Letters, instead of the one Issue Statement. With the combination of all the aforementioned factors, is the dismissal of an appeal involving seven hospitals and hundreds of thousands of additional dollars in Medicare DSH reimbursement the *appropriate remedy and/or exercise of sound discretion?*

64.     Finally, the applicable provisions of the Administrative Procedures Act provides that the "reviewing court shall... hold unlawful and set aside agency action... found to be (a) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ... (c) in excess of statutory jurisdiction, authority, or limitation, or short of statutory right; (d) without observance of procedure required by law; or (e) unsupported by substantial evidence. 5 U.S.C. §706(2).

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Providers pray for an Order:

(a)    Reversing and setting aside the PRRB decision to dismiss Plaintiffs' appeal;

(b)    Declaring invalid and enjoining application of Transmittal 12785;

(c)    Remanding each appeal back to the Board for full adjudication on the merits;

(d)    Awarding the costs of suit incurred by Plaintiffs;

(e)    Awarding Plaintiffs interest as required by 42 U.S.C. § 1395oo(f)(2); and,

(f)    For such other and further relief as the Court may deem just and proper under the circumstances.


DATED: June 19, 2025                    Respectfully submitted,

                                        /s/Alan J. Sedley
                                        Alan J. Sedley, Esq. Bar# OH0017
                                        ALAN J. SEDLEY LAW CORP.
                                        18880 Douglas, Suite 417
                                        Irvine, CA 92612
                                        (818) 601-0098
                                        asedley@sedleyhealthlaw.com

                                        Counsel for Plaintiffs

22